IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GERALD DAVIS FULLER | * | |
| Plaintiff | * | |
| v | * | Civil Action No. WMN-12-43 |
| WARDEN BOBBY P. SHEARIN, et al. | * | |
| Defendants | * | |

***

# MEMORANDUM

Plaintiff Gerald Fuller ("Fuller") filed the above-entitled Complaint pursuant to 42 U.S.C. §1983.  Defendants Green, Harbaugh, Kenny, Murphy, Rodericks, Shearin, and Ziolkowski ("Correctional Defendants"), by their attorneys, move to dismiss or, in the alternative for summary judgment.  ECF No. 23.  Counsel for Corizon, Inc. ("Corizon") moves separately to dismiss or for summary judgment.  ECF No. 26.  Fuller opposes the motions.  ECF Nos. 31 – 34.  After review of the pleadings, exhibits, and applicable law, the Court determines that a hearing is unwarranted.  Local Rule 105.6 (D. Md. 2011).  For the reasons that follow, both motions for summary judgment (ECF No. 23 and 26) will be GRANTED and judgment will be ENTERED in favor of Defendants.  The remaining non-dispositive motions will be DENIED for the reasons stated herein.

## Background

Pursuant to this Court's Memorandum and Order of March 8, 2012, the claims raised in both the original and amended complaints were limited to Fuller's allegation that during his confinement to Eastern Correctional Institution (ECI) he was assaulted on June 12, 2011, by a correctional officer and an inmate, resulting in a broken ankle for which he did not receive proper medical care; he was denied access to courts because he did not have access to legal

materials and writing materials; and he was the subject of retaliation through failure to process his ARP complaints. ECF Nos. 6 and 7. All other claims were dismissed. Fuller filed a second Amended Complaint following the partial dismissal. ECF No. 14.

Plaintiff's Allegations

Fuller claims that on June 12, 2011, he was knocked to the ground and broke his ankle. He states he was immediately sent to segregation and did not receive medical attention following the incident. On August 15, 2011, he claims the injury was finally "recognized" and the response was to shackle him and transfer him to another prison, North Branch Correctional Institution (NBCI). He surmises that the transfer was done to cover up the failure to treat the broken bone. ECF No. 4 at pp. 5 – 6.

Fuller also claims he was also suffering a "dangerously low Potassium level" at the time of the injury that "may have been induced by poisoning (deliberate) or negligent prescribing of medication." ECF No. 4 at pp. 4 - 5. He states that Corizon[1] failed to provide required medication which resulted in prolonged high blood pressure and resulted in an enlarged heart. He states when he complained of fatigue "the defendant" alleged he was not taking prescribed blood pressure medication and ignored his worsening heart condition. He claims his potassium depletion resulted from diuretic medications prescribed by medical personnel. ECF No. 14 at pp. 1 – 2.

Fuller states that he had an appeal pending in the Maryland Court of Special Appeals at the time he was transferred to NBCI. He explains that a "paralegal researcher and investigator" he has known for over 20 years mailed printed covers for his reply brief, carbon paper to make copies, a money order for postage, and paper and pens which arrived on September 2, 2011, but all of the materials have disappeared. He further claims he was unable to make his argument

---

[1] He does not name any other defendants regarding his medical care in the amended complaint. ECF No. 14.

concerning a common law right to appeal and has been unable to access the common law of England as it existed in 1776 or Maryland's common law statutes.  He has attempted to file Administrative Remedy Procedure (ARP) complaints regarding these matters, but nobody will collect or process them.  ECF No. 4 at p. 8.  Fuller further claims: that on an unspecified date his property was seized by Lt. P. Ziolkowski; that he was required to send two boxes of property out of the institution; and that he was provided legal copies from his classification counselor which were so light they were illegible.  ECF No. 14 at p. 3.

Fuller further claims he complained to Warden Green that inmates were not being given adequate access to legal material at ECI on September 23, 2010.  ECF No. 14 at p. 2.   He states that he personally told Green that she should not have spent money on religious holiday parade floats instead of hiring a librarian or buying computers for the library and that she responded she was through with him.  Following that incident, Fuller states he was denied permission to receive his word processor and was threatened with a transfer to NBCI.  Fuller alleges that when it became known that he had assisted another inmate in filing a complaint about the treatment he received from a correctional officer, he was set up, and the events occurring on June 12, 2011 and his eventual transfer to NBCI followed as retaliation by Green.  *Id*.

Fuller also alleges he and other inmates are subjected to what amounts to an illegal tax when they are forced to forfeit their property without due process.  He states there is a scheme in place where prisoners who forfeit their property must purchase new property from vendors chosen by the Warden, resulting in additional sales tax and revenue.  He also claims that the Warden gets a kickback from the vendors selling goods and that the scheme is "tantamount to extortion and fraud."  ECF No. 14 at p. 3.

Defendants' Response

Correctional Defendants state that Fuller was not assaulted by correctional staff on June 12, 2011; rather, he assaulted another inmate. ECF No. 23. Fuller was observed by a correctional officer engaging in an argument with inmate Gary Mundell. When Mundell turned his back on Fuller, Fuller hit Mundell in the back with his right fist. Mundell returned the punch to Fuller's mouth, causing Fuller to fall to the floor. Fuller was discovered to be in possession of a homemade knife which was attached to his hand. After the incident, Fuller was escorted to the medical department where he voiced no complaint about an ankle injury, but was treated for superficial lacerations to his mouth. *Id*. at Ex. A, p. 3.   Correctional Defendants assert that the claims raised regarding Fuller's access to courts are barred by the doctrines of res judicata and collateral estoppel.

The only named "medical defendant" in this action is Corizon, a corporation contracted to provide medical care to Maryland Division of Correction inmates. Corizon claims Fuller was provided with constitutionally adequate medical care. ECF No. 26. Specifically, Corizon states that Fuller was seen by a nurse on June 12, 2011, following the altercation with Mundell. At that time the nurse noted Fuller had been hit in the mouth, resulting in blood inside his mouth from superficial lacerations to his lips. The bleeding was controlled, no loose teeth were observed, and ice was applied to the area. No other injuries were reported or noted. *Id*. at Ex. A, p. 116.

Corizon also alleges that despite the fact that Fuller was seen on numerous occasions for other reported health issues, he did not report any problems or injury to his ankle until June 18, 2011, when he complained of a "swollen ankle" which he claimed had been swollen for almost a week.[2] ECF No. 26 at Ex. A, p. 121. Fuller was seen by a doctor who noted that the left ankle

---

[2] In addition to the swollen ankle, Fuller claimed he was suffering from headache, neck pain, grip weakness in his right hand, and pain in his right knee, and had issues regarding prescribed pain medication. None of these issues

was swollen but that there was no pain when the ankle was moved.  Fuller was told to report back to medical if the swelling worsened or did not improve.  On June 21, 2011, Fuller again complained, among other things, that his left foot was swollen.  Upon examination swelling was noted, but there was no deformity or impairment and it was determined it would be monitored.  *Id*. at  Ex. A, p. 381.  Three days later Fuller again requested an examination of his ankle and he was started on a course of Motrin, 400 mg, four times per day.  *Id*. at pp. 380 and 126.

Fuller was seen again on June 28, and 30, 2011; on July 12, 19, 20, 23, and 28, 2011; and on August 3, 2011, for reasons other than complaints regarding his ankle.  ECF No. 26 at Ex. A, pp. 93 – 95, 114, 132, 133, 136, 138, 140, 141, and 145.  Indeed, Fuller was seen on July 28, 2011, regarding a skin condition on his feet and to discuss his concerns regarding his potassium level, but neither complained of ankle pain, nor requested treatment of his ankle.  *Id*. at p. 141.

On August 9, 2011, Fuller was again examined for a complaint of left ankle pain and right knee pain.[3]  At that time he related that he thought he may have hit his ankle during the night, but could not remember any direct trauma.  *Id*. at p. 150.  An x-ray was performed and revealed a fracture of indeterminate age with the joint space preserved.  *Id*. at p. 149.  Because Fuller was transferred from ECI to NBCI on August 15, 2011, he was not seen again by medical personnel until August 20, 2011.[4]  At that time it was noted Fuller's ankle was tender to the touch and further x-rays were performed on August 24, 2011.  Again, the same fracture was noted.  *Id*. at p. 158.  The doctor at NBCI ordered bottom bunk status for Fuller and authorized his use of a cane for one year.  Additionally, all of his medications were continued.

---

were discussed with the provider when Fuller was seen.  ECF No. 26 at Ex. A, p. 118; *see also* ECF No. 31 at Ex. 3, p. 6 (sick call slip dated June 13, 2011).

[3] Fuller has an arthritic knee.

[4] It is unclear what treatment, if any, was provided to Fuller when it was discovered he had a fractured ankle on August 9, 2011.

Fuller was seen again on August 30, 2011, after he filed a sick call slip indicating he was experiencing right knee pain, left ankle pain, as well as other unrelated symptoms. Chief among those symptoms reported was Fuller's assertion that he was feeling shaky and weak, which was attributed to issues related to his blood pressure and low potassium levels. At the time it was noted that Fuller walked to the clinic unassisted with a normal gait. ECF No. 26 at Ex. A, p. 168.

On September 15, 2011, Fuller's ankle was examined again because he complained it was painful. At the time his ankle was not swollen and there was no deformity noted. *Id*. at Ex. A, p. 179. On September 23, 2011, the doctor noted Fuller had a decreased range of motion in his left ankle and requested a consultation with an orthopedic specialist in light of his continuing complaints of pain. *Id*. at pp. 185 – 89. Another x-ray of Fuller's ankle was performed on October 7, 2011; no changes in the fracture to his left ankle were noted since the earlier x-ray from August 24, 2011. *Id*. at p. 198.

Fuller was seen by an orthopedic specialist, Dr. Krishnaswamy, at Bon Secours Hosptial in Baltimore, on November 8, 2011. At that time the fracture to Fuller's ankle was healing with good alignment and the doctor advised Fuller to continue wearing his Ace bandage[5] and continue weight bearing as tolerated. Additionally, Fuller was provided with range of motion exercises to perform. *Id*. at p. 413. On November 22, 2011, Fuller was seen at NBCI for a follow-up appointment and Dr. Krishnaswamy's recommendations were adopted. *Id*. at p. 227. Fuller did not complain any further about his ankle after that appointment.

## Non-Dispositive Matters

Fuller seeks an enlargement of time and appointment of counsel because of his ongoing health conditions as well as for purposes of conducting discovery. ECF No. 31. Specifically he states he needs to obtain affidavits, statements or interviews of three inmates and three

---

[5] It is unclear from the record when the ace bandage was first provided to Fuller.

correctional employees. He claims this discovery will lead to evidence such as a Serious Incident Report and photographs created after the June 12, 2011 incident; the cause for his potassium depletion; the reason why Officer Rodericks was fired; the complaints filed by inmates and staff regarding Rodericks performance; documents from Corizon and Maryland Correctional Institution at Hagerstown (MCIH) regarding the "Hagerstown Region Medication theft ring;" and records and information concerning the death of an inmate. ECF No. 31 at pp. 1 and 2. Fuller claims this evidence will allow him to prove a conspiracy regarding his adjustment conviction. He also states he needs more time to obtain documentation for "the source, authority and architect of the Prisoner slave property policy." *Id*. at p. 2. It is clear Fuller's stated purpose for discovery relates to information that is not relevant to the claims raised; or relates to matters previously litigated before this court. Additionally, he has filed several pleadings in opposition to the pending dispositive motions. ECF Nos. 31 – 36. Thus, the motions are denied.

Fuller contends that he could not accept service of Defendant Corizon's Motion to Dismiss or for Summary Judgment because he did not know what had been removed from the envelopes by prison staff and concludes that, "[t]herefore Corizon has failed to respond." To the extent he offers these assertions as a basis for his entitlement to default judgment, Fuller is raising a frivolous argument. ECF No. 31 at pp. 2. He cannot simply refuse service for personal reasons and insist no response has been filed. Additionally, it is clear Fuller received a copy of Corizon's motion. *See* ECF No. 33.

Fuller filed a "Motion for Leave to Clarify Corizon Defendants" on August 10, 2012, almost one month after Corizon filed a Motion to Dismiss or for Summary Judgment based in part on its assertion that the doctrine of *respondeat superior* does not apply in a case of this type. ECF No. 30. He asserts that he is possibly suffering from "dementia induced by cardiac and

7

chemical insufficiencies" brought on by the disabilities resulting from "deliberate indifferent treatment," which he offers as an explanation for his lack of clarity regarding his claim against Corizon. *Id*. at p. 1. The motion attempts to add new claims concerning Fuller's treatment, or alleged lack of treatment, for hyperkalemia[6] and related heart issues. He claims the failure to provide him with medication as well as the actions of employees confiscating his medication and not returning it resulted in a heart attack as well as an "undiagnosed enlarged heart."[7] *Id*. at p. 3.

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Fuller's proposed amended claims was not filed within the time-frame referenced; however, Rule 15 dictates that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The proposed amendment bears no relation to the claims raised in the original complaint and do not include dates of the occurrences described. As such the amendment does not give fair notice to Defendants of the specifics of the claims and does not enable them to fashion a reasonable response thereto. *See* Fed. R. Civ. P. 8. Under such circumstances, this Court has the discretion to deny leave to amend. Fuller's Motion for Leave to Clarify shall be denied to the extent it raises new claims. With respect to Fuller's

---

[6] A review of later-filed pleadings reveals that Fuller is actually alleging he suffers from potassium depletion or hypokalemia. ECF Nos. 31 – 36.

[7] Fuller expands on this claim and alleges there was a theft ring in existence in the Hagerstown regional prisons involving the theft of medications from prisoners. He claims his blood pressure medication was confiscated in May of 2009 and he was not provided with more medication until the following month. During the delay he claims he began suffering headaches and his hypertension worsened, with blood pressure readings of 210 over 118. He maintains this interruption in his medication led to a cardiac episode which damaged his heart. ECF No. 31 at pp. 5 – 6.

claim that there is a "prisoner slave" property policy that operates to enrich correctional officials and improperly tax prisoners, that claim was previously litigated and rejected in this Court. *See Fuller v. Horning*, Civil Action WMN-11-1917 at ECF No. 63, pp. 17 -19. (D. Md.). Thus, the proposed amended claim on the property policy is barred and allowing the amendment would be a futility. To the extent Fuller's motion raises matters for consideration in the context of Corizon's dispositive motion, it shall be so considered.

Also pending are Correctional Defendants' Motion for Extension of Time (ECF No. 22) and Corizon's Motion to Seal (ECF No. 27). Both motions shall be granted.

**Standard of Review**

Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1968-69 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 1969. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,* 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

9

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### Access to Courts

Prisoners have a constitutionally protected right of access to the courts. *Bounds v. Smith*, 430 U. S. 817, 821 (1977). However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) *quoting Lewis*, 518 U.S. at 355. "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

Where there has been a final judgment on the merits in a prior suit; an identity of the cause of action in both the earlier and the later suit; and an identity of parties or their privies in the two suits, *res judicata* is established. *See Pension Ben. Guar. Corp. v. Beverley*, 404 F. 3d 243, 248 (4th Cir. 2005). The doctrine of *res judicata* precludes the assertion of a claim after a judgment on the merits in a prior suit by the same parties on the same cause of action. *See Meekins v. United Transp. Union*, 946 F. 2d 1054, 1057 (4th Cir. 1991). In addition, "'[n]ot only does res judicata bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Id.*, *quoting Peugeot Motors of America, Inc. v. Eastern Auto Distributors, Inc.*, 892 F. 2d 355, 359 (4th Cir. 1989).

Fuller's access to courts claim was previously litigated in this Court. *See Fuller v. Green*, Civil Action WMN-11-1751 (D. Md.). In that case, Fuller sought to enjoin correctional officials from depriving him of legal materials, including his word processor, and claimed his transfer from ECI to NBCI following the June 12, 2011 incident was retaliatory. *Id*. This Court denied injunctive relief, finding that Fuller's ability to maintain prolific filings in numerous pending legal cases[8] was unaffected by the deprivation of his legal materials and his word processor. Additionally, the Court found there was no evidence to support his claim his transfer from ECI to NBCI was retaliatory. *See id*. at ECF No. 13 and 14.

Fuller maintains that the doctrine of *res judicata* should not bar consideration of his claim because he was not permitted to amend his complaint in the earlier case to include the claims asserted here; the prior judgment is not final; and he was not provided a full and fair opportunity to litigate the claim. ECF No. 31 at pp. 10 – 13. In the previous case, this Court denied Fuller's motion to amend the complaint because:

> The Amended Complaint concerns essentially every claim Plaintiff has attempted to litigate since 2007, all of which are either time barred or barred by res judicata. ECF No. 25. Where, as here, the proposed amendment to the complaint appears to be a futility, this Court has the discretion to deny leave to amend. Thus, the amended complaint will not be served and the additional defendants named will not be added.

*Fuller*, Civ. Action WMN-11-1917 at ECF No. 27, p. 2. Thus, his assertion regarding his opportunity to amend the previous Complaint does not prohibit application of *res judicata* to the claim in the instant case. Moreover, Fuller's assertions against Warden Green were in fact considered in Civil Action WMN-11-1917, where he sought an injunction requiring Green to return his legal property. *Id*. at ECF No. 63, p. 6. This Court determined that Fuller was not entitled to injunctive relief. After reviewing all of the pending legal actions Fuller had at the

---

[8] *See also Fuller v. Horning*, Civ. Action WMN-11-1917 at ECF No. 63, pp. 13 – 17, detailing Fuller's pending claims, including challenges to his criminal convictions, and noting the basis for the state court's dismissal of each.

time, the Court found that the confiscation of his property had no adverse impact on his ability to bring a meritorious claim concerning his conviction or the circumstances of his confinement. *Id*. at pp. 13 – 18.   The instant claim concerning access to courts covers the same time frame and involves the same parties and is barred by *res judicata* and subject to dismissal.

Conspiracy Claim

Fuller objects to this Court's characterization of his claim against Officer Rodericks as one of excessive force.  Rather, he states the claim is actually that Rodericks and inmate Mundell were involved in a conspiracy against him. ECF No. 31.   He explains the conspiracy dates back to September of 2010 when the librarian at ECI left and Warden Green closed the library.  *Id*. p. 7.  Inmates began complaining about the lack of library time and Fuller states he was elected as a tier representative in the context of the controversy.  He claims, however, his appointment as a representative was vetoed by Lt. Murphy because of Fuller's adjustment history.  In response Fuller filed an ARP.  *Id*.  Apparently no adverse actions were taken against Fuller until April 20, 2011, when he claims Murphy told Officer Kenney, who was assigned to the library, to write Fuller up if he did anything.  Fuller claims Kenney began "screaming" at him. *Id*.

Fuller next states that on April 19, 2011, while he was doing his job as a tier laundry man, Officer Rodericks became hostile and refused to open doors to cells.  He states that one inmate in particular was very agitated over Rodericks' behavior and, in order to calm the inmate down, Fuller promised to help him write the officer up.  Later, Lt. Murphy told Rodericks that Fuller was the one who assisted the inmate in writing her up and Rodericks began "pursuing" Fuller.  ECF No. 31 at p. 8.

On May 30, 2011, Fuller states he was admitted to the hospital due to a cardiac problem, and remained there until June 6, 2011.  He was kept in the infirmary at ECI until June 9, 2011, at

which time he was sent back to what he refers to as a "gang tier." Fuller believed he should have been sent to a medical tier instead. He claims that he observed inmate Mundell talking to Rodericks and, later, Mundell spit in Fuller's face. Fuller further claims Mundell handed him a note demanding that Fuller give Mundell items of his property. Fuller alleges he disarmed Mundell and waited for a tier officer so he could turn the weapon over, but Mundell hit Fuller. Fuller then tried to push Mundell away, but Mundell knocked Fuller to the floor, breaking his ankle. ECF No. 31 at p. 9.

Fuller also claims that Corizon and Green conspired to have him transferred from ECI to NBCI, despite his medical condition. ECF No. 34. He asserts he put in numerous sick call slips regarding his ankle and, right after it was established that his ankle was broken, he was shackled and transferred. He points to Physician's Assistant Bush's report of August 9, 2011, which notes the condition of Fuller's ankle as acute and notes that Fuller is taking more medication than prescribed in an effort to control his potassium level on his own. Fuller states that the x-ray technician and Bush failed to notify Green that his ankle was broken, failed to include an order for a cane, and failed to determine if Fuller was stable enough medically for a transfer. Fuller claims Corizon should have notified prison officials of his broken ankle and prison officials should have investigated how he broke his ankle and should not have approved him for a transfer. ECF No. 34 at pp. 3-5.

An essential element for a claim of conspiracy to deprive a plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *See Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1006-07 (4th Cir.1987). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagon v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir.1981). Fuller must allege facts establishing that

defendants shared a "unity of purpose or a common design" to injure him. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946).

In essence, Fuller's conspiracy claim regarding Rodericks and Mundell is based on his belief that Rodericks was angry with him for an incident occurring two months earlier and that, because she was seen talking to Mundell, Rodericks must have told Mundell to assault Fuller. He attempts to connect unrelated incidents and extrapolate a common plan or scheme among everyone whom he perceives to have wronged him. Fuller's suspicions, unsupported by any objective evidence, are not facts establishing even an inference that an agreement existed between Rodericks and Mundell; therefore, the claim fails. Fuller's claim regarding a conspiracy to have him transferred fails on its face. He states in part that there was no communication regarding his broken ankle between Corizon and Green; thus, he has failed to allege facts establishing the two acted in concert. He has failed to meet his burden on the conspiracy claims.

### Deliberate Indifference to Serious Medical Need

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but

failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virgiinia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown* 240 F. 3d at 390; *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983); *see also Trulock v. Freeh*, 275 F. 3d 391, 402 (4th Cir. 2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v.*

*Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) *citing Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Corizon argues that as a corporation, it "cannot 'personally participate' in the non-treatment of a patient's injury, absent some policy or directive to withhold treatment." Fuller does not raise a claim regarding corporate policy with regard to his broken ankle or his other claims regarding his potassium level or his blood pressure medication. Thus, Fuller has not alleged facts from which a claim of supervisory liability could be construed as to Corizon. Additionally, his claim that Defendant Green is liable because she knew of his broken ankle and did not insure he received medical care is unsupported by the record.

In light of his self-represented status, Fuller's claims must be further analyzed to determine if he has stated a claim against specific, individual medical care providers. Fuller claims he immediately complained that his ankle was hurt, but the nurse who evaluated him following the altercation advised him to put in a sick call slip, which he did the following day. ECF No. 31 at Ex. 3, p. 6. The examination that followed the June 12, 2011, incident did not indicate that Fuller complained his left ankle had been hurt; he claims this is due to the nurse who examined him telling him to submit a sick call slip later regarding his ankle, and he did so

the next day.  After Fuller was seen on August 9, 2011, his ankle was examined, and an x-ray on August 10, 2011, confirmed a fracture.  Until that time, Corizon staff operated under the assumption that Fuller's swollen ankle was a consequence of his high blood pressure.   At most, the misdiagnosis states a claim of negligence, which does not state a cognizable constitutional claim.  *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (mere negligence or malpractice does not rise to a constitutional level).

Fuller broadens his claim regarding his medical care to include allegations that a medication theft ring operated in the Hagerstown region prisons in 2009, resulting in a one month interruption of his blood pressure medication.  He claims this interruption led to permanent damage to his heart which was the cause for his hospital stay just before the June 12, 2011, incident at ECI.[9]   ECF No. 31 at pp. 5 – 6.  He further alleges the failure to replace his blood pressure medications quickly enough in 2009 resulted in a cardiac arrest and led to an enlarged left ventricle.  Fuller claims that Corizon "and its agents" are not providing proper treatment for his "serious medical conditions," including left ventricular hypertrophy, degenerative joint disease of the cervical spine, and hypokalemia or fluctuating potassium levels.  He explains he is required to monitor his potassium levels on his own and must do so by how he feels and how often he urinates.  He also claims he should be given a neck brace to prevent damage to his neck and should be subjected to tests to see if he has other joints that are damaged.  Finally, he claims the failure to properly treat his left ankle and his right arthritic knee has resulted in development of a painful plantar's wart on the bottom of his left foot. ECF No. 32 at pp. 3- 4. It is Fuller's belief that if he had not been in a weakened state on June 12, 2011,

---

[9] It is also Fuller's belief that if he had not been in a weakened state on June 12, 2011, Mundell would not have been able to knock him down and his ankle would not have been broken.  ECF No. 31 at pp. 5 – 6.

Mundell would not have been able to knock him down and his ankle would not have been broken.  ECF No. 31 at pp. 5 – 6.

The conduct prohibited by the Eighth Amendment is intentional conduct.  To establish a violation there must be some basis to believe that Defendant knows there is a serious medical condition, but has refused necessary care for inappropriate reasons resulting in a prisoner's undue suffering.  There is no requirement that all suffering be eliminated at any costs; medical science has its limitations and progressive diseases like arthritis are currently incurable.  Nor is there a requirement that each prisoner receive the medical care and testing he or she deems appropriate for the conditions suffered.  Fuller's assertions that he should be tested to determine which of his joints are subject to degenerative disease and that he should be given a neck brace are simply demands for desired medical care.  Additionally, his claim that all of his medical conditions are traceable to a failure to provide medication for one month occurring more than three years ago, is speculative and does not demonstrate deliberate indifference.  Interruptions in medication delivery are, at best, a malpractice claim, assuming there is evidence of negligence on the part of those responsible for delivering it.

Defendants are entitled to judgment in their favor.  A separate Order follows.


  September 24, 2012                                           /s/
Date                                                   William M. Nickerson
                                                       Senior United States District Judge